## Commonwealth v. Kurtz

*Samuel S. Humes*, assistant district attorney, for Commonwealth.

*John C. Youngman*, for defendant.

CRICHTON, P. J., fourth judicial district, specially presiding, October 27, 1938.—On September 3, 1937, defendant, accompanied by Benjamin Kiess, Stabler Kiess, Sidney Gehr, and Lester Houseknecht, was operating his 1934 DeSoto automobile, purchased the day before as a second-hand car, traveling in a southerly direction on a concrete road between the Borough of Montoursville and the Village of Loyalsock in the County of Lycoming. Near

the intersection of this highway with what is known as Macon Lane, leading to one Calvert's restaurant, his car came into collision with a Buick car driven by Raymond Marshall, and occupied by Marshall and Marion Confer, and proceeding north. Benjamin Kiess, Stabler Kiess, and Raymond Marshall were killed. No peace officer was present until after the accident. Defendant was indicted for manslaughter on three counts. At the trial the court charged the jury that if it found from the evidence that defendant was operating his car at a rate of speed in excess of 50 miles per hour and that this speed was the cause of the deaths, or if it found from the evidence that he was operating the car in such a manner as to exhibit a reckless disregard of the safety of others and that this recklessness was the cause of the deaths, then they might find him guilty as charged. Defendant was convicted. There was ample evidence to warrant the jury in declaring him guilty of criminal recklessness, which counsel does not appear to question, taking, however, the apparently sound position that since the court's instructions allowed a verdict of guilty on a finding *either* of recklessness or of excessive speed, if there was no competent and sufficient evidence of the latter the verdict should not be allowed to stand. Only a general exception was taken to the charge, but, of course, if basic and fundamental error is involved, the failure to enter specific exceptions does not justify the overruling of the motion for a new trial.

The reasons assigned all have to do with the question of excessive speed. Defendant maintains: (1) That under the provisions of The Vehicle Code of May 1, 1929, P. L. 905, sec. 1002, as last amended by the Act of June 5, 1937, P. L. 1718, sec. 2, 75 PS §501, he could not lawfully be found to have exceeded the speed limit except on the testimony of a peace officer following him and using a motor vehicle equipped with a speedometer tested for accuracy within a period of 30 days prior to the alleged violation; (2) that even if this is not the law, incompetent evidence was admitted which, though later stricken out,

was prejudicial to him; and (3) that irrespective of the Act of 1937 the evidence as to speed was not sufficient to carry the case to the jury on that phase of the offense charged. If he is right as to any one of these propositions a new trial must be awarded.

If any argument is necessary to sustain the position that the Act of 1937, supra, and The Vehicle Code of 1929, supra, of which it is an amendment, deal only so far as their criminal provisions are concerned, with the trial and punishment of offenses created thereby, a mere cursory reading of their titles will supply that argument. It is contended, however, that since the statute prescribes an exclusive method for the conviction of defendant on a charge of exceeding the speed limit, such method must be followed in determining whether a defendant is guilty of involuntary manslaughter as the result of excessive speed. In other words, counsel would have us hold that no one can be shown to have operated a car beyond the limits allowed by law except by the testimony of one or two peace officers, no matter whether the controversy be a prosecution for violation of the statutory provision, a prosecution for manslaughter, or a civil suit for damages based on negligence of which illegal speed is evidence. If this contention is to prevail, injured persons seeking compensation for damages due to that cause may as well abandon their just claims unless at least one peace officer, and in some instances two, can testify as to the timing of the offender over a specified minimum distance. If this contention is to prevail one may drive his automibile through a busy thoroughfare at an illegal rate of speed, killing right and left, and fail of conviction of manslaughter because he has not been timed over a measured stretch by two peace officers. It is argued that such driving would constitute recklessness and therefore warrant conviction. This is merely to chase oneself around the tree. In many cases, the *only* element of recklessness is speed, and if the latter cannot be shown the former remains unproven.

Section 2(*b*) of the Act of 1937 forbids speed of more than 50 miles an hour under the conditions existing at the place of this accident. Subsection (*d*) is as follows:

"When the rate of speed of any vehicle is *timed* on any highway within a business or residence district, where official speed limit signs are erected, as provided in this section, *for the purpose of ascertaining whether or not the operator of such vehicle is violating* a speed provision of this act, such time shall be taken by not less than two (2) peace officers, one of whom shall have been stationed at each end of a measured stretch, and no conviction shall be had upon the unsupported evidence of one (1) peace officer, except as hereinafter provided, and no such measured stretch shall be less than one-eighth (⅛) of a mile in length. Under all other conditions, the rate of speed shall be timed, for a distance of not less than one-quarter (¼) mile, by a peace officer using a motor vehicle equipped with a speedometer tested for accuracy within a period of thirty (30) days prior to the alleged violation." (Italics supplied.)

It is our opinion that the methods of detection and conviction here prescribed apply only to charges of violation of the terms of this statute itself. These provisions clearly were intended to put an end to speed traps, operated sometimes for personal or municipal profit, productive of petty annoyances to motorists, but barren of beneficial results to the public generally. The methods set forth are exclusive when it is sought to convict on violations of the provisions of the act in business or residence districts or on the open roads. They are procedural, and relate only to offenses created by the statute itself. They apply when a vehicle is "timed"—that is, observed with a speedometer or watch "for the purpose of ascertaining whether or not the operator . . . is violating a speed provision of this act". No conviction (that is, no conviction of a charge of violating the provisions of the act) may be had except upon the testimony of one peace officer or two, depending upon the locality of the alleged offense.

It is to be noted that this provision as to the quantity of evidence necessary to a conviction is added to the provision that the timing shall be done by peace officers, who shall measure the time over a specified distance. It seems clear to us that subsection (*d*) was inserted for the sole purpose of protecting motorists from unfounded, biased, or trifling charges of violating the statute, and that the provisions of this subsection are inapplicable to a charge of manslaughter. As applied to the matter now under consideration, we cannot agree with the statement in Commonwealth v. Hagy, 41 Dauph. 282, 285, that "The essential of the offense is that the violation as to speed must continue for a quarter of a mile." The offense is defined by subsection (*b*), which forbids a speed of over 50 miles an hour without regard to distance; and subsection (*d*) merely regulates the manner in which speed may be proved when a person is prosecuted for violation of the statute in this respect. Indeed, as was pointed out in Commonwealth v. Wolfgang, 120 Pa. Superior Ct. 252, 257, certain speed violations are created by the statute to which the methods of conviction laid down in subsection (*d*) cannot be applied. Can it be said that if one drives his car past a country school in recess at a rate of more than 15 miles per hour he can be proven guilty only if he is followed by a peace officer for at least one fourth of a mile? Or that if as a result of such excessive speed he kills a child at play, he may be convicted of manslaughter only on the testimony of such officer? If the answer to either of these questions is yes, then in 99 cases out of 100 he cannot be convicted at all.

The whole difficulty of the defense in this case arises from the attempt to stretch the provisions of the Act of 1937 to cover situations to which it was never intended to apply. It is true that when no ambiguity exists in the terms of a statute the interpretation must be in accordance therewith. But it is also true that the intent must be determined, not only by the words used, but by the subject matter. In this subsection of the act under consideration

the subject matter is clearly the method of proof required for conviction of certain offenses created by the act itself. While we may not depart from that method in such cases, neither may we protect an offender by seeking to apply it to subjects not contemplated by the enactment. We have yet to be shown any authority for the proposition that one must be *convicted* of an unlawful act before he can be successfully charged with manslaughter as the result thereof.

Defendant further contends that irrespective of the terms of the Act of 1937 there was not sufficient evidence of illegal speed to warrant the court in submitting that question to the jury. The lawful maximum speed at the point where the accident happened was 50 miles per hour. One occupant of defendant's car testified that shortly before the accident they were going 50 or 60 miles per hour; that the windshield was lowered and they then went faster; and that there was no change in this speed as they entered the left curve upon which, or immediately beyond which, the accident happened. On cross-examination by defendant's counsel he admitted that at the coroner's inquest he testified that just before the collision defendant was driving 60 miles an hour. He further said that he "supposed" they slowed up a little, but didn't say when. As the accident happened practically at the curve and in the daytime it is reasonable to believe that the car may have slackened speed somewhat before the actual collision, particularly as this witness also testified that it swerved to its left, then back to the right, then to the left again, then starting back to the right struck the other car. There was further testimony that defendant's car leaned to the right coming around the curve, that when sighted first by an occupant of the other car the two right wheels were off the berm; that it struck the Buick's right front with its own left front although they were going in opposite directions and the Buick was on its right side of the highway; that it traveled two or three hundred

feet after it began to swerve and before it hit the Buick; that immediately before the accident Stabler Kiess cried "Look out Kurtzy"; that there was a blood mark down the highway for 65 feet; that both cars were practically demolished—"a mess of junk"; that after the accident defendant's car was lying on its right side, over the ditch on its left of the highway, and 30 or 40 feet beyond the Buick, although the collision had been almost head on. The photographs offered in evidence confirm the testimony as to the condition of the cars after the accident, and indicate a terrific impact. There was no allegation that the Buick was traveling at an unreasonable or unlawful rate of speed. The witness Everett testified that he was driving a third car just ahead of the Buick; that he first saw the Kurtz car when it was three to five hundred feet from him; that he turned into the Macon Lane, and traveling 15 to 20 miles an hour had proceeded 30 or 35 feet into the lane when the collision came. Making allowance for inaccuracies of observation, this still indicates tremendous speed on the part of defendant. We are of the opinion that the direct testimony of Gehr and Everett, especially when taken into consideration along with the position and condition of the vehicles after the accident, was amply sufficient to warrant a finding on the part of the jury that defendant was not only driving recklessly, but was exceeding the lawful limit of 50 miles per hour. Indeed, the evidence as to the condition and situation of the cars after the accident, the swerving on the curve on a dry road in the daytime, and the manner of their contact, might well warrant these inferences without the direct testimony cited: Schoepp v. Gerety, 263 Pa. 538. Defense counsel advanced the theory that the accident was the result of a blow-out, but there was no direct testimony that a blow-out did take place, and the witness Gehr testified he heard none. While the tire placed in evidence indicated a blow-out, it might as easily have been the result of the accident as the cause of it—or it might have been the result of excessive speed on the

curve. Defendant took the stand but did not testify on the subject of the accident, merely stating that he could not even remember being in the car when it happened; and the third survivor among the occupants testified to the same effect. It is at least singular that two out of three survivors among the five who were riding together should have been the victims of amnesia. Defendant is not entitled to the benefit of the rule that he is not to be prejudiced by his failure to take the stand. In this case he did take the stand, and the credibility of his testimony was for the jury. It may well be that his statement that he did not remember the event and therefore could throw no light on it was not believed by them.

We are asked to grant a new trial for the further reason that the presiding judge at first admitted the testimony of Miss Confer, a passenger in the Buick car, to the effect that when she first observed the DeSoto it was coming at the rate of 80 miles an hour. It is to be noted that her estimate scarcely exceeds the figure that may be arrived at from a computation based on the testimony of the witness Everett. The question, however, is whether she was qualified to offer an opinion. She said that she had ridden in cars for a number of years, had observed speedometers, could gauge their speed "somewhat, not expertly," could "to a certain extent" form an opinion as to the speed of a car, explaining this as meaning that she could tell whether or not the car observed was exceeding the limit of 50 miles per hour. On further questioning she said without qualification that she could "estimate the speed of a car." She was then allowed, under objection, to estimate the speed of defendant's car, which she fixed as above stated. On cross examination she said she had never driven a car, had no experience in speed except that derived from riding, never paid much attention to the speedometer, and had never ridden faster than 48 or 49 miles per hour, but had seen other cars go faster. A motion to strike out her testimony

was then refused, but after the close of the Commonwealth's case the ruling was reversed, the evidence stricken out, and the jury directed to pay no attention to it. In the charge the same caution was given.

It might well be argued that this witness had sufficiently qualified herself and that we should have allowed her testimony to stand, but the doubt was resolved in favor of defendant. But even if its original admission was erroneous defendant was not prejudiced thereby, in view of the court's admonitions to the jury and in view of the other ample and convincing evidence in the case. The witness presented no particular appeal to the sympathies of the jury, nor did her testimony tend to excite prejudice. It was simply a statement of a fact which the jury could very properly find from the other evidence, at the same time following the court's instructions as to the testimony of Miss Confer. The assignment is without merit: Commonwealth v. Fugmann, 330 Pa. 4, 18.

The notes of testimony indicate that the trial judge, while discussing the testimony of the witness Gehr, said, inter alia, "This defendant said there was no change in speed from the time they went around the curve until the accident happened." The use of the word "defendant" instead of "witness" was either a slip of the tongue on the part of the judge or an error in transcription. At any rate, the jury could not have misunderstood the meaning. Even if taken literally it did no harm to defendant, and no exception was taken thereto, nor was the court's attention called to it, as defense counsel admit was necessary.

Defendant had a fair trial, the verdict was fully justified by the evidence, and we find no harmful error in the rulings or charge of the court.

### Order

Now, October 27, 1938, the motion for a new trial is overruled, and it is directed that defendant appear in court on November 2, 1938, at 2 p.m., for sentence.